UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

               Plaintiff,

                            (S-1) 05-cr-1278-02 (NRB)

     -V-

ARNALDO CABRERA,

               Defendant.
-------------------------------------------------------X

<u>MEMORANDUM IN AID OF SENTENCING</u>

Joseph A. Bondy
20 Vesey Street, Suite 1200
New York, N.Y. 10007
(212) 219-3572
josephbondy@mac.com

1

THE LAW OFFICES OF

# J O S E P H   A.   B O N D Y

JOSEPH A. BONDY

20 VESEY STREET
SUITE 1200
NEW YORK, NY 10007
TEL 212.219.3572
FAX 212.219.8456

JOSEPHBONDY@MAC.COM

May 14, 2009

(By ECF and Hand Delivery)
Hon. Naomi R. Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>United States v. Arnaldo Cabrera, (S-1) 05-cr-1278-02 (NRB)</u>

Dear Judge Buchwald:

Counsel submits the following memorandum on behalf of the Defendant, Arnaldo Cabrera, whose sentencing is to occur at 3:00 p.m. on May 20, 2009. It is respectfully submitted that imposing a sentence well below the advisory Guidelines, to a term at or near the ten-year mandatory minimum, would satisfy the objectives of punishment under 18 U.S.C. § 3553(a)(2).

## **Procedural Background**

On December 8, 2005, federal agents arrested Mr. Cabrera. Contrary to the Federal Rules of Criminal Procedure, Mr. Cabrera was not brought to a judge to be afforded the Constitutional protections of a speedy arraignment. Instead, Mr. Cabrera "waived" his right to speedy presentment and counsel, which this Court later upheld as valid. After several days of cooperating, he was provided with a CJA lawyer selected by the prosecutors' office. In light of Mr. Cabrera's earlier disclosures and cooperative efforts, the attorney advised him to continue to cooperate, as, in his view, the case was indefensible.

In the end, Mr. Cabrera made a series of consensually monitored telephone calls with various co-conspirators, including Mika Salguero and Jose Vasquez. His assistance was directly responsible for much of the evidence leading to Milka Salguero's arrest and ultimate decision to plead guilty and cooperate. As the Court has noted, Mr. Cabrera "describ[ed] various details of the smuggling operation, including the names of the individuals involved and the date of the next shipment." 7/18/08 Decision and Order, at p. 4. Mr. Cabrera denies the prosecution's assertion that he intentionally implicated "the wrong Jose Vasquez." In any event, his information substantially assisted in the investigation, arrest, and prosecution of the real Mr. Vasquez, as well as in the conviction and cooperation of Ms. Salguero, which are mitigating factors cognizable under U.S.S.G. § 5K2.0 and 18 U.S.C. § 3553(a), discussed infra.

In January 2006, Mr. Cabrera admittedly left the jurisdiction, although no prosecution of him had been unsealed and commenced, and he had not been arraigned, bailed, or apprised of his rights or responsibilities by a judicial officer. Lacking judicial oversight of his "handling" by agents and the prosecution, Mr. Cabrera returned to Santo Domingo. On April 17, 2007, Mr. Cabrera was arrested. He waived extradition, losing any possible protection of a treaty-imposed limitation on sentencing, and was finally arraigned in the Southern District of New York on May 17, 2007.

On January 28, 2009, Mr. Cabrera pled guilty to the First Superseding Indictment, charging him with Conspiracy to Possess with Intent to Distribute Five Kilograms or More of Cocaine, 21 U.S.C. § 841(B)(1)(a), and Conspiracy to Import into the United States from a Place Outside Thereof Five Kilograms or More of Cocaine, 21 U.S.C. § 963. Forfeiture allegation and substitute asset provisions were also included in the Indictment.

Offense Conduct

Mr. Cabrera was one of numerous individuals charged with cocaine importation and distribution activities emanating out of Newark Airport. For many years, individuals have been operating various cocaine importation schemes out of Newark Airport, and, for many years, federal agents had been exacting speedy trial waivers under contested circumstances. See, e.g., United States v. Daniel Rosas, 98-cr-00192-01 (JEI)(D.N.J.).

Mr. Cabrera's involvement was significant in terms of drug-quantities alone, culminating in a June 2005 409-kilogram cocaine seizure in New Jersey. His relevant conduct concededly involved well over the 150-kilogram cocaine threshold needed to trigger the maximum base offense level of 38 under the Guidelines. See U.S.S.G. § 2D1.1(c)(1).

Mr. Cabrera's activities also, when the "Colombian supplier" (PSR ¶ 16), his crew, Jose Vasquez, Milka Salguero and her crew are included, involved over five people. They were also, given the scope of the conspiracy, concededly extensive. Nevertheless, he submits that a four-level leadership enhancement is more properly ascribed to the "Colombian supplier," Ismael Pantoja, and that he is also less culpable than co-conspirator Jose Vasquez, whom the PSR describes as "responsible for locating cocaine suppliers in Colombia, Venezuela and the Dominican Republic." (PSR ¶ 13). Mr. Cabrera submits that he was not a leader or manager as much as a supervisor of the Newark operation, and that a two-level leadership enhancement most accurately depicts his relative culpability under the Guidelines. A four-level enhancement is not warranted under the facts, and serves only to further increase his advisory Guidelines range to a level "greater than necessary" to achieve the purposes of punishment under 18 U.S.C. § 3553(a).

Mr. Cabrera participated in the offense out of a desire to make more money. Although not a solitary act, his involvement nevertheless marked a significant deviation from his otherwise law-abiding and hard-working life. He is deeply ashamed and remorseful for his conduct.

### Advisory Sentencing Guidelines Calculations

The PSR adopts the prosecutor's <u>Pimentel</u> letter calculations without exception. They are as follows:

Pursuant to U.S.S.G. § 2D1.1, the base offense level is 38. Pursuant to U.S.S.G. § 3B1.1(a), 4 levels are added for leadership. Pursuant to § 3C1.1, 2 levels are added for Mr. Cabrera's obstruction of justice through fleeing the jurisdiction and, according to the prosecution, providing false information during a proffer session. Three levels are subtracted for acceptance of responsibility, pursuant to §3E1.1. (PSR ¶¶ 7; 26-35).

The <u>Pimentel</u> letter and PSR both compute the resulting total offense level to be 41. When combined with Mr. Cabrera's Criminal History Category of "I", the advisory Sentencing Guidelines range is asserted to be 324 to 405 months' imprisonment, before the Court's consideration of the sentencing factors set forth in the Guidelines and 18 U.S.C. § 3553(a).

Mr. Cabrera, on the other hand, asserts that his total adjusted offense level is 37, and his corresponding advisory Guidelines range is 210 to 262 months' imprisonment. The differences lie in Mr. Cabrera's assertion that only a two-level leadership enhancement is warranted, and in his denying that he obstructed justice, first, because when he left the jurisdiction there was no prosecution that had been formally commenced against him, at least to his knowledge, second, because he denies having provided the government with a false positive identification of the

wrong Jose Vasquez, and, third, because he did not commit perjury at the Court's suppression hearing, but rather, unbeknownst to Your Honor at the time, he was a special education student whose "verbal and nonverbal skills were on a mildly retarded level," and who, because he "is isolated from others," "usually withdraws rather than express[es] negative feelings." (See PSR ¶62, School Psychologist's Report).

Interestingly, these educational and mental health records undercut much of the Court's articulated reason for rejecting Mr. Cabrera's suppression arguments that he could not read or intelligently understand the waivers he entered because, "First, Cabrera claimed he was incapable of reading English, in spite of the fact that he is a high school graduate, was the proprietor of a fish market for a considerable period of time, and was employed at Newark Airport at the time of his arrest." See 7/15/08 Decision and Order, at p. 7. Having mildly retarded verbal and non-verbal skills, owning a fish-market, and working as an unskilled laborer at a company that placed food carts on airplanes simply does not equate with literacy in legal matters.

### Mr. Cabrera's Personal, Education, and Family Background

Mr. Cabrera was born on March 5, 1968, in Santiago, Santo Domingo. One of four children, he was raised by his parents under moderate economic circumstances. (PSR ¶¶ 43-44). Mr. Cabrera's father immigrated to the United States when he was a baby. His father worked here as a building maintenance man, and his mother was a baby-sitter. In 1980, Mr. Cabrera came to the United States with his family, joining his father and seeking better opportunity. He attended special education classes in Junior High School and at George Washington High School in Manhattan, until the time he turned 21 and was "Discharged out of High School." (PSR ¶ 61).

Mr. Cabrera did better in math than reading and writing, and had to repeat the eighth and ninth grades due to "attendance and comprehension issues." (PSR ¶62). Mr. Cabrera's school records confirm that he had an "individualized education program." His school psychologist reported that, at the age of 15, Mr. Cabrera was:

>...Uncommunicative, apathetic and appeared depressed. Although verbal and nonverbal skills were on a mildly retarded level, his lack of motivation and depression are thought to have lowered his scores. Arnaldo is isolated from others and usually withdraws rather than express negative feelings. (PSR ¶ 62).

The psychologist also recommended "individual counseling for the defendant to work through 'his intense sense of isolation.'" (PSR ¶62).

Mr. Cabrera has worked at entry-level positions since he was approximately 12 years old. He has worked bagging groceries, stocking store shelves, parking cars in

lots and as a valet, and for a food-service company at the airport. It was this latter employment that germinated his participation in the offense.

Mr. Cabrera was working at the MDC Brooklyn, preparing food trays for delivery to inmates, until the time that his untreated abraded big toe erupted into a diabetic ulcer and cellitus, requiring an eight-day hospitalization. He had been a good worker, and was earning approximately $20.00 monthly.

Mr. Cabrera has suffered from Type II Diabetes since approximately 1993. As a result, he has already experienced a "sight-threatening" condition, according to MDC physician Dr. Peter Goldstein. His teeth are loosening, his blood sugar requires modulation though medication, and he has recently began to suffer from diabetic ulcerations of his feet and associated infections. Notwithstanding Mr. Cabrera's requesting through HIPPA waiver a complete set of his treatment records, the MDC Brooklyn is yet to provide them. Instead, at 11:30 a.m. today, the MDC faxed a second round of a still-incomplete set of records. Missing are: (a) all hand-written records of treatment for the year predating the manifestation of the ulcer; (b) any records of care from the end of December 2008 to March 2009; (c) the actual Beekman Downtown Hospital treatment records from his eight-day hospitalization for the condition; and (d) the discharge summary from that stay, which allegedly are reviewed upon an inmate's return from a hospitalization.

Since Mr. Cabrera's medical records are still incomplete, he respectfully reserves his right to make additional arguments as necessary based upon the contents of the records and renews his request to adjourn sentencing so that he can obtain these materials sufficiently in advance of the hearing to make meaningful use of them. Fundamental fairness would seem to require allowing him to make fair use of his own records at sentencing, and to bring the full scope of their contents to the Court's attention before it passes judgment.

Nevertheless, the records supplied do confirm that Mr. Cabrera's blood sugar was recorded as 264 in May 2008, and that there is no record of him ever receiving another glucose reading until May 2009, after he returned from his eight-day hospitalization to treat his diabetic ulcer, at which time his level was a substantially lowered 121. On the records produced, there is no way of determining what Mr. Cabrera's blood sugar was leading up to the time of his recent ulcer, because there are no indications that it was ever tested despite its being abnormally high. The reduction in glucose levels may well be entirely the result of medications received during his eight days out of BOP custody.

Similarly, the records confirm that in November 2008, Mr. Cabrera was diagnosed with Diabetic Retinopathy and Macular Edema. Despite the November 19, 2008 medical entry that Mr. Cabrera needed to be "scheduled ASAP for Retina Clinic," it was not until May 8, 2009, at the Court's urging, that this visit was

conducted. At that visit, Mr. Cabrera learned that his actual eye surgery was to have been performed no later than February 19, 2009.

When Mr. Cabrera requested this Court's intervention, it was due to what both he and I felt was poor treatment of his diabetic condition while in Bureau of Prisons Custody. A hearing was held, at which a fraction of Mr. Cabrera's medical records were produced. None of his treatment records from his recent hospitalization were provided. MDC Brooklyn staff physician Dr. Peter Goldstein, who appeared telephonically and was never placed under oath, indicated that he had not seen or asked for the production of the Beekman Hospital records. He had no idea as to the treatment Mr. Cabrera received. Dr. Goldstein also admitted that Mr. Cabrera's wound after-care had "fallen through the cracks."

Photographs of Mr. Cabrera and his family are attached as Exhibit A. (ECF Redacted). His family, children, and friends have written supporting letters, set forth in Exhibit B. (ECF Redacted). These materials provide insight into Mr. Cabrera, and show that he is not an irredeemable criminal, but simply a human being who has transgressed.

Mr. Cabrera has three siblings, and he is the oldest son. His brother and sisters have looked to him for support throughout their entire lives. Brother Luis recalls Mr. Cabrera buying him sneakers when he was a young boy, and how he is "very loving with his kids." (PSR ¶53). Sister Carolina is still employed at the family run grocery store, "Tony's Grocery Fish Market," and sister Liliana visits Mr. Cabrera regularly. Mr. Cabrera has three minor children, 16, 12, and 7, to whom he still provides support money. They also visit regularly with him. In all, the family is supportive, even as he stands before them ashamed of his criminal involvement and their increasingly dire circumstances.

Again and again, Mr. Cabrera's friends and relatives have confirmed his early work history, devotion to his family, and kindness. Aside from the period of his involvement in the instant offense, Mr. Cabrera's life has involved manual labor in supermarkets and parking lots, a special education in New York City public schools, a sense of acute isolation and depression, and a humble family environment.

Mr. Cabrera has also extended himself to people in need simply because it was the right thing to do, in one instance assisting a relative in overcoming the pain and trauma of being badly burned and disfigured. He has also always tried to impress the value of education—which he did not have—upon his young relatives, so that they could grow up to be in a better position than he was. Your Honor can consider the value of this legacy of kindness and support to the less fortunate in determining what a sentence "no greater than necessary" should be.

**The Guidelines**

Concededly, Mr. Cabrera's Diabetes, hypertension, macular degeneration, and diabetic retinopathy do not meet the very high standard of "extraordinary" that is required for a downward departure under the Guidelines.

His post-arrest efforts at cooperation, and voluntary disclosure of many details of his offense, are, however, factors that can warrant a reduced sentence under the "favored" departure provisions of § 5K2.0 of the Guidelines. Accordingly, Mr. Cabrera first respectfully requests a Guidelines departure under § 5K2.0 for his "super-acceptance" of responsibility and substantial assistance to the prosecution in the investigation and prosecution of others, including the ensuing decision of Milka Salguero to plead guilty and cooperate.  Mr. Cabrera's proffer notes and the DEA-6 reports they generated are attached hereto as Exhibit C. (ECF Redacted).

**18 U.S.C. § 3553(a)**

The Sentencing Guidelines were held to be advisory in United States v. Booker, 125 S.Ct. 738 (2005). Although courts must still consider the Guidelines range, 18 U.S.C. § 3553(a)(4)&(5), they also must consider all of the other factors identified in 18 U.S.C. § 3553(a). Id. Courts no longer have to sentence a defendant within a narrow range unless an "extraordinary" circumstance removes their case from "the heartland."

3553(a) requires a court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." These are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. § 3553(a) also directs courts to consider the nature and circumstances of the offense and history and characteristics of the offender, the kinds of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty for similar conduct, and the need to provide restitution to any victims of the offense.

Here, the "nature and circumstances of the offense" were serious, involving the importation of hundreds of kilograms of a poisonous, addictive, destructive narcotic for distribution into our local community. Mr. Cabrera held a supervisory role in the United States side of the conspiracy, and had used his knowledge of Newark Airport to increase its chances for success. Nevertheless, it was a straightforward offense with no aggravating elements. There were no firearms

possessed, or acts or threats of violence. Mr. Cabrera succumbed to greed. Unlike the Colombian principals of the scheme, Mr. Cabrera only engaged in importation into one airport over a substantially more limited time. His conduct involved far less personnel, structure, and control than did that of, for example, Colombian fugitive supplier Ismael Pantoja and his circle of trusted lieutenants.

Looking at the "history and characteristics of the offender," Mr. Cabrera immigrated here at a young age. He was always of modest means, and was a special education student until he was compelled to leave high school by virtue of turning 21. Mr. Cabrera is also a father of three minor children, and a devoted brother, uncle and son. He had been a leader of his family, and worked in entry-level, unskilled jobs, bagging and stocking groceries and parking cars since he was 12. Mr. Cabrera's family letters speak of the devastating impact that his involvement in the offense and continued incarceration has had upon them. Mr. Cabrera, unable to help or support them in any way, is being punished too. His circumstances certainly have taught, prevented, and deterred, but he can neither rehabilitate himself nor help his children while incarcerated.

3553(a) also requires that the Court consider whether the sentence imposed reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. Id. at § 3553(a)(2)(A). Mr. Cabrera fully accepts responsibility for his involvement. He will never break the law again. He has been punished and completely humbled. Sentencing Mr. Cabrera below the Guidelines would promote respect for the law and provide just punishment.

The Court's sentence must also promote *the public's* respect for the law. The problem with "promoting respect for the law" by imposing a Guidelines sentence here is that the "war on drugs" is a failure and disaster, much of the public eschews mandatory minimum sentencing, and such a lengthy sentence undermines respect for the law and is easily prone to interpretation as a product of a grid-like sentencing system devoid of any meaningful discretion. Taking into account the use of a waiver of presentment to avoid commencing the judicial process, and co-opting Mr. Cabrera into becoming an informant without the benefit of the advice of a lawyer first, is further repugnant to a good deal of the population's concept of the rule of law. Respect for the law would be enhanced by judicial discretion and fact-finding, operating here to temper justice with mercy, and to provide offenders like Mr. Cabrera with an opportunity to attempt to rebuild their lives outside of a prison before it is too late.

Mr. Cabrera is remorseful for what he did, and has had ample time to reflect upon and understand how his actions affected his community, family, and self. After having been a law-abiding leader of his family for almost his entire life, Mr. Cabrera is now ashamed and faces a sentence long enough to foreclose his living freely ever again with his mother, siblings and children. His arrest has been a powerful deterrent.

His ensuing efforts to cooperate served to effectively sever all of his prior criminal ties and to make recidivism far less likely. A 324 to 405 month sentence of incarceration, imposed against a father, with a wife and three sons, who is the primary provider for his family and their source of emotional strength is greater than necessary to promote respect for the law and provide just punishment.

3553(a)(2)(B) provides that a sentence should "afford adequate deterrence to criminal conduct," while § 3553(a)(2)(C) provides that a sentence should serve to "protect the public from further crimes of the defendant." Mr. Cabrera has been deterred. He will not commit future crimes, he is substantially older and less vigorous, he faces near certain deportation, and the public is safe. The experience of his arrest, conviction and imprisonment at the Metropolitan Detention Center, Brooklyn, for nearly two years has been a unique deterrent. Mr. Cabrera has severed the criminal ties that brought him here, and has no means to or interest in committing future crimes. For all of these reasons, a reduced sentence would satisfy the objectives of deterrence and protection.

3553(a)(2)(D) directs a court to impose a sentence sufficient to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment *in the most effective manner*." (Emphasis supplied). Mr. Cabrera has worked from the time he was young and still has the ability to work and overcome adversity. He does not need additional educational or vocational training, but it also couldn't hurt. He does require regular medical treatment for his diabetes, hypertension, and sight-related problems, administered in a clean and responsive environment. The BOP is simply not "the most effective" medical care provider. Finally, "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Mr. Cabrera thus cannot continue his personal rehabilitation—a factor to be considered under § 3553(a)—in jail. There is accordingly no reason for continued incarceration on any of these grounds.

3553(a)(3)-(7) require a court to evaluate "the kinds of sentences available," "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines," "any pertinent policy statements," "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and "the need to provide restitution to any victims of the offense." Here, the Court is free to fashion a sentence "no greater than necessary" to account for all of these factors. Given the totality of Mr. Cabrera's case and life circumstances, his post-arrest efforts at cooperation, long work history, and the devastating impact that continued incarceration would have upon his health and his children's development, imposition of a term well below the advisory Guidelines would be sufficient to achieve all of the purposes of sentencing under 18 U.S.C. 3553(a).

Many of the aims of sentencing have been satisfied by Mr. Cabrera's initial post-arrest cooperation, followed by his public arrest and repatriation, detention for the past two years, and collateral punishment in the form of deteriorating health, automatic deportation, and loss of his family's financial and emotional stability. A Guidelines sentence, imposed against a first-offender with three minor children who substantially assisted the prosecution before fleeing to avoid continued unbridled exposure to dangerous activities, and who has "fallen through the cracks" of the prison medical system and the judicial system's rights to speedy presentment and to counsel, is excessive. Instead, imposition of a sentence at or near the ten-year mandatory minimum is sufficient to honor all of the objectives of sentencing under 18 U.S.C. § 3553(a).

## Conclusion

For all of these reasons, it is respectfully requested that Your Honor sentence Mr. Cabrera to the shortest term possible, along with any other relief that is necessary, under § 3553(a)(2).

Respectfully submitted,
*Joseph A. Bondy*
Joseph A. Bondy

Cc:     AUSA Maria Douvas
        (By Hand, with all Exhibits)